IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

CHRIS FULKERSON                                                                    PLAINTIFF

v.                              NO. 3:17-cv-00065 PSH

NANCY A. BERRYHILL, Acting Commissioner                          DEFENDANT
of the Social Security Administration

MEMORANDUM OPINION AND ORDER

Plaintiff Chris Fulkerson ("Fulkerson") began this case by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, he challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon the findings of an Administrative Law Judge ("ALJ").

Fulkerson maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole.[1] It is Fulkerson's position that his residual functional capacity was erroneously assessed, and he offers two reasons why. First, Fulkerson maintains that he cannot perform light work, as the ALJ found, because Fulkerson cannot satisfy the standing or walking requirements of light work. Second, Fulkerson maintains that the ALJ's credibility analysis was fleeting and focused exclusively on Fulkerson's daily activities, making no mention of his work history.

---

[1] The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of the most a person can do despite his limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). In the assessment, the ALJ must evaluate the claimant's subjective complaints. See Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001). The ALJ should consider the medical evidence and evidence of the claimant's daily activities; the duration, frequency, and intensity of his pain; the dosage and effectiveness of his medication; precipitating and aggravating factors; and functional restrictions. See Id. [citing Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984)].

The record reflects that Fulkerson was born on January 24, 1964, and was fifty years old when he filed his applications for disability insurance benefits and supplemental security income payments. He alleged in the applications that he had become disabled beginning on March 27, 2014, because of impairments that included coronary artery disease, double bypass surgery, and gout. See Transcript at 147, 151.

A summary of the evidence relevant to Fulkerson's ability to stand or walk reflects that he saw Dr. Leslie McCasland, M.D., ("McCasland") on March 6, 2013, for complications caused by gout in his feet. See Transcript at 667-669. McCasland noted that Fulkerson was taking Colcrys and allopurinol every day for gout and was tolerating the medications well. McCasland also noted that although Fulkerson had a "mini-flare on the dorsum of his right foot," he was otherwise doing "fairly well." See Transcript at 667. McCasland continued Fulkerson on his medications and urged him to continue using Colcrys.

2

On March 29, 2013, Fulkerson saw Dr. James Murrey, M.D., ("Murrey"). See Transcript at 395-399. Fulkerson reported that he had stopped taking allopurinol because it had caused complications, but he had restarted it when he began having "a lot of gout again in his right … foot that was very painful." See Transcript at 395. Murrey recommended that Fulkerson discontinue Colcrys and allopurinol and recommended that he begin taking Decamix. Murrey also spoke at length with Fulkerson about his need to maintain a low protein diet because certain foods could cause a flare up of his gout.

Fulkerson saw McCasland on August 14, 2013. See Transcript at 650-653. Fulkerson reported a flare up of gout in his left mid-foot. He reported no "dietary indiscretion" and reported having taken all of his medications. See Transcript at 650. McCasland prescribed a Medrol Dosepak to be used in the event of a flare up and continued the use of Uloric, which Fulkerson had previously been prescribed.

Fulkerson saw Murrey on October 15, 2013. See Transcript at 380-384. With respect to Fulkerson's gout, Murrey's progress note reflects the following: "[McCasland] has [Fulkerson] on Uloric as well as Colchicine, which [Fulkerson] states he is taking [three] days a week for his gout. He feels this has helped his flare ups. He had it in his foot …" See Transcript at 380. Murrey continued Fulkerson on his medications.

On December 16, 2013, McCasland saw Fulkerson for his gout. See Transcript at 644-646. Although Fulkerson reported "twinges in his big toes," he did not report any flare ups of his gout. See Transcript at 644. He also reported that he was taking and tolerating his medications. McCasland continued Fulkerson on his medications.

On March 27, 2014, Fulkerson presented to a NEA Baptist Clinic emergency room complaining of chest pains and a syncope, or near syncope, event. See Transcript at 492-508. Testing was performed, and the diagnosis was dehydration.

On April 11, 2014, Fulkerson underwent a stress echocardiogram. See Transcript at 490-491. The results of the "[t]echnically adequate study" were within normal limits. See Transcript at 491. The summary portion of the report includes the following notation: "[e]xcellent exercise tolerance with adequate heart rate response with no induced chest pain." See Transcript at 491.

Fulkerson saw Murrey again on April 18, 2014, for a follow-up examination. See Transcript at 363-367. Murrey noted in his progress note that Fulkerson was scheduled to return to work on April 21, 2014. Murrey recorded Fulkerson's history of present illness as follows:

> ... [Fulkerson] was hospitalized ... for a near syncope episode at work. This occurred associated with exertion. He also had preceding this some right sided chest pain. He was also noted to be hypotensive, hypoglycemic, and tachycardic. He was admitted. He had a ventilation profusion lung scan and chest x-ray and lab cardiac enzymes that were negative. He has also had a stress echocardiogram done April 11th that did not show any evidence of reversible ischemia. He had been doing strenuous work and he had prior to that time been used to office work. ... He has not had chest pain as severe as when he was in the hospital. ...

See Transcript at 363. Murrey opined that Fulkerson was "resolved from his syncope episode" but likely had "poor exercise conditioning." See Transcript at 367.

Over the next two months, Fulkerson continued to complain of syncope, or near syncope, events; dehydration; sweating; and lightheadedness. See Transcript at 482-287, 362, 361. It appears that the symptoms were brought about by physical activity.

4

Fulkerson saw Dr. Matt Haustein, M.D., ("Haustein") on May 19, 2014, for chest pains. See Transcript at 472-475. Fulkerson reported that his symptoms included "chest heaviness," dyspnea, episodes of "near syncope," and cramping in his hands and legs. See Transcript at 472. He reported having the symptoms every time he exerted himself. Haustein observed that Fulkerson had a normal gait, normal balance, and normal muscle tone and strength. Haustein continued Fulkerson on his medications and recommended a cardiac catheterization.

On May 27, 2014, Haustein performed the recommended cardiac catheterization. See Transcript at 617-619. Although the testing revealed a normal left ventricular systolic function, the testing also revealed "[s]evere native vessel coronary artery disease …" See Transcript at 618.

Three days later, Fulkerson underwent double bypass surgery performed by Dr. Paul Levy, M.D., ("Levy"). See Transcript at 529-531. The progress note reflects that the surgery was precipitated by Fulkerson's "worsening angina on exertion" with "marked fatigue and presyncopal episodes." See Transcript at 530.

On June 6, 2014, Fulkerson saw Murrey for a check-up. See Transcript at 356-360. Murrey noted that Fulkerson had done well since the surgery and was not having any new complaints. Murrey made no significant changes in Fulkerson's medications.

The same day, Fulkerson was seen at a cardiac rehabilitation center for physical therapy. See Transcript at 411. He was required to walk on a treadmill. While doing so, he complained of mild shortness of breath but no chest pain. He was encouraged to increase the time and workload of his exercises "a little bit at a time with each visit." See Transcript at 411.

Fulkerson was thereafter seen at the rehabilitation center for physical therapy on what appears to have been seven occasions. See Transcript at 412, 413, 414, 415, 416, 417, 418. The progress notes from the physical therapy reflect that Fulkerson responded favorably to treatment and tolerated exercise well, only occasionally complaining of chest pains and shortness of breath.

McCasland saw Fulkerson again on June 30, 2014. See Transcript at 517-520. McCasland recorded Fulkerson's history of present illness to be, in part, as follows:

> … [Fulkerson] is slowly getting his strength back. His last gout flare was in February. He took a Medrol Dosepak and it quickly resolved. It was in his feet. He has not had any since. He has not been on his gout medicine since he was in the hospital and he is on so many medications right now he is skeptical about restarting his gout medications. Even prior to his surgery he felt like he was sore all the time. …

See Transcript at 517. Fulkerson reported fatigue, chest pains, and discomfort. McCasland diagnosed gout and anemia and continued Fulkerson on his medications. McCasland also noted that Fulkerson had a Medrol Dosepak for his use in the event he experienced a gout flare.

On July 8, 2014, Levy saw Fulkerson for a post-operative examination. See Transcript at 513-516. Levy observed that Fulkerson was fully ambulatory. Levy was of the opinion that Fulkerson should "be able to return to work without restrictions [two] months from surgery." See Transcript at 513.

Haustein saw Fulkerson again on July 31, 2014. See Transcript at 677-680. Haustein's progress note reflects that Fulkerson complained of dyspnea upon exertion and chest pains. Haustein observed that Fulkerson had a normal gait, normal balance, and normal muscle tone and strength in his upper and lower extremities.

6

On October 30, 2014, Dr. Roger Troxel, M.D., ("Troxel") performed a general physical examination of Fulkerson at the request of the Commissioner. See Transcript at 686-690. Fulkerson's complaints included increased dyspnea on exertion and a decreased ability to stand and walk. Troxel found that Fulkerson had a full range of motion in all of his extremities, save a reduced range of motion in his lumbar spine and knees. Troxel observed that Fulkerson had a normal gait and coordination, could stand/walk without assistive devices, and could walk on his heels and toes. Troxel's diagnoses included coronary artery disease, osteoarthritis, and gout. Troxel opined that Fulkerson had a mildly diminished ability to stand and walk secondary to dyspnea.

Fulkerson saw Murrey on April 3, 2015, after experiencing flare-ups of gout. See Transcript at 703-704. Murrey noted that Fulkerson had been controlling the flare-ups with diet but had not been taking Uloric.

Murrey saw Fulkerson again on October 22, 2015. See Transcript at 720-721. Fulkerson reported having shortness of breath with exertion. His symptoms were similar to when he had stenting for coronary artery disease, although the chest pains he once had were no longer present. Murrey referred Fulkerson to a pulmonologist.

Murrey saw Fulkerson on November 25, 2015, for a follow-up examination for his complaints of shortness of breath. See Transcript at 718-719, 722. Fulkerson also complained of chest pains, noting that he had experienced "[two] episodes of chest pain in [the] past [one] week." See Transcript at 722. He reported that the episodes were approximately one hour in duration and occurred once at rest and once after climbing stairs. The episodes resolved spontaneously. He was referred to a cardiologist and instructed to seek emergency room assistance if the episodes reoccurred.

On December 23, 2015, Haustein saw Fulkerson for his shortness of breath and chest pains. See Transcript at 732-735. Haustein noted, inter alia, that Fulkerson had normal breath sounds and a normal range of motion. Haustein diagnosed, in part, unspecified chest pains, ischemic chest pains, and "atherosclerosis of native coronary artery of native heart without angina pectoris." See Transcript at 734-735. Fulkerson was instructed to take prescription medication for his heart and continue taking aspirin indefinitely.

Haustein saw Fulkerson again on January 6, 2016, at which time he underwent a myocardial perfusion stress test. See Transcript at 737-738. The results of the test were within normal limits.

Fulkerson returned to see Murrey on February 28, 2016. See Transcript at 740-741. Fulkerson reported still having dyspnea upon exertion, although Murrey noted that a cardiac work-up had been negative. Murrey diagnosed, in part, dyspnea on exertion.

In the months that followed, Fulkerson continued to complain of difficulty breathing while exerting himself. For instance, he saw Murrey's advanced practice nurse on April 6, 2016, and complained of dyspnea on exertion. See Transcript at 742.

Fulkerson completed a series of documents in connection with his applications. See Transcript at 251-258, 260-264, 265-266, 267-274. The documents reflect that he worked as a production worker from August of 1998 until August of 2006, as an inventory controller from August of 2006 until August of 2008, and as an ingredient handler from July of 2009 until July of 2014. He experiences pain upon standing and walking and cannot stand or walk for long periods of time. He can attend to his own personal care, perform some household chores, but cannot perform yard work because it is too tiring.

Fulkerson testified during the administrative hearing. See Transcript at 65-80. He has a Bachelor of Science degree in radiology. He summarized his work history and explained the discrepancy between his work history and his educational background. It was his opinion that he lacked adequate education in radiology. He also noted that he would have had to move to Memphis, Tennessee, to find a job, and he did not want to move there. Fulkerson testified that his rehabilitation following his double bypass surgery involved walking on a treadmill and riding a stationary bike. He acknowledged that the progress notes from his rehabilitation indicate that he responded favorably to treatment. His ability to walk is restricted, and he experiences shortness of breath whenever he "move[s] around a lot." See Transcript at 77. He did not believe he could work a job that required him to be on his feet for at least six hours during an eight hour period. He can walk for only about five minutes before having to stop and rest. Fulkerson's sister attends to his shopping needs and performs the household chores. He could not recall a physician having imposed any restriction on his activities after he was medically cleared following his double bypass surgery.

The ALJ assessed Fulkerson's residual functional capacity and found that he is capable of performing light work with some additional restrictions. In so finding, the ALJ gave only partial weight to Troxel's opinions because Troxel did not specify what he meant by "'mildly diminished' nor did his examination reveal shortness of breath." See Transcript at 59. The ALJ also made no mention of Fulkerson's work history. The ALJ found at step four that Fulkerson could not return to his past relevant work but found at step five that there is other work a hypothetical individual with Fulkerson's limitations could perform.

9

Fulkerson maintains that his residual functional capacity was erroneous assessed because he is incapable of performing the standing or walking requirements of light work and because inadequate consideration was given to his extensive work history.[2] For the reasons that follow, though, the Court finds that substantial evidence on the record as a whole supports the ALJ's assessment of Fulkerson's residual functional capacity.

First, the ALJ adequately considered the medical evidence. In short, it is unremarkable. Although Fulkerson experienced occasional flare-ups of gout, it was largely controlled by medication and diet. When Fulkerson presented to a NEA Baptist Clinic emergency room on March 27, 2014, complaining of chest pains and a syncope, or near syncope, event, testing indicated that he was simply dehydrated. A stress echocardiogram was performed on April 11, 2014, and the results were within normal limits. The summary portion of the report includes the following notation: "[e]xcellent exercise tolerance with adequate heart rate response with no induced chest pain." See Transcript at 491. It is true that Fulkerson underwent double bypass surgery on May 30, 2014, but he appears to have made an acceptable recovery from the surgery. For instance, Murrey noted in his June 6, 2014, progress note that Fulkerson had done well since the surgery and was not having any new complaints. In addition, the progress notes from Fulkerson's physical therapy reflect that he responded favorably to treatment and tolerated exercise well, only occasionally complaining of chest pains and shortness of breath. Haustein saw Fulkerson on January 6, 2016, and performed a myocardial perfusion stress test. The results of the test were within normal limits.

---

[2] Light work requires that the claimant stand or walk for a total of six hours in an eight hour workday.

Fulkerson acknowledged during the administrative hearing that no medical cause had then been found for his shortness of breath. He testified that "[t]hey can't find out why I'm having shortness of breath. The last procedure I had was a CT, and it came back normal. And I still have shortness of breath." See Transcript at 69.

The ALJ also properly considered the observations of the medical professionals. They repeatedly observed that Fulkerson has a normal gait, normal balance, normal muscle tone and strength. For instance, Troxel observed that Fulkerson has a normal gait and coordination, could stand/walk without assistive devices, and could walk on his heels and toes. Troxel also observed that Fulkerson had a full range of motion, save a reduced range of motion in his lumbar spine and knees

Fulkerson takes issue with the ALJ's treatment of Troxel's opinions, opinions the ALJ accorded only partial weight. The Court finds no error in the ALJ's treatment of Troxel's opinions. Troxel opined that Fulkerson had a "mildly diminished" ability to stand and walk secondary to dyspnea. Troxel failed, though, to explain what he meant by the phrase "mildly diminished." Although requesting clarification from Troxel as to what he meant by the phrase would have been helpful, it was not necessary because there was sufficient information for the ALJ to have made an informed decision. See Pratt v. Asture, 372 Fed.Appx. 681 (8th Cir. 2010).[3] Troxel's opinions could also be discounted because he made no mention of Fulkerson's complaints of shortness of breath, complaints that the ALJ could and did find credible.

---

[3] In Coombs v. Berryhill, --- F.3d ---, 2017 WL 6614564 (8th Cir. 2017), the Court of Appeals determined that an ALJ erred when he failed to seek clarification of the phrases "no acute distress" and "normal movement in all extremities." In this instance, though, no clarification was necessary for two reasons. First, the ALJ gave little weight to Troxel's opinion that Fulkerson has a "mildly diminished" ability to stand and walk secondary to dyspnea. Second, the record contains other treatment notes detailing Fulkerson's ability to stand or walk.

Second, the ALJ's consideration of the non-medical evidence, while not exhaustive, was adequate. The ALJ properly considered Fulkerson's daily activities, activities that included attending to his own personal care, preparing simple meals, performing some household chores, shopping, and visiting family. The ALJ also properly considered Fulkerson's medication and treatment. The ALJ could and did find that the treatment was largely routine and conservative. Although Fulkerson experienced occasional flare-ups of gout, it was largely controlled by medication and diet. His chest pains and shortness of breath were reoccurring problems, but the ALJ credited the complaints and incorporated a work-related restriction for the problems.

It is true that the ALJ made no mention of Fulkerson's work history. Although Fulkerson's work history was good and showed significant earnings for several years, see Transcript at 225, a remand is not warranted for at least two reasons. First, the ALJ is not required to discuss every Polaski v. Heckler factor in evaluating a claimant's subjective complaints. See Casey v. Astrue, 503 F.3d 687 (8th Cir. 2007). Second, any error on the part of the ALJ was harmless. The ALJ credited Fulkerson's complaints of chest pains and shortness of breath by limiting him to light work, and it is not clear how a more extensive analysis of his work history would have led to a different assessment of his residual function capacity.

The governing standard in this case, i.e., substantial evidence on the record as a whole, allows for the possibility of drawing two inconsistent conclusions. See Culbertson v. Shalala, 30 F.3d 934 (8th Cir. 1994). The ALJ crafted an assessment of Fulkerson's residual functional capacity that limited him to light work, and Fulkerson has not shown why the ALJ erred in doing so. In short, the ALJ could find as he did.

On the basis of the foregoing, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings. Fulkerson's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 12th day of January, 2018.

_____
UNITED STATES MAGISTRATE JUDGE